FILED
CLERK
12/11/2024 1:58 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------X

MATTHEW LEE ARMSTEAD, JR.,

Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

---------------------------------X

MEMORANDUM & ORDER
20-CV-2841 (JS)

APPEARANCES

For Plaintiff: Daniel A. Osborn, Esq.
Osborn Law P.C.
43 West 43rd Street, Suite 131
New York, New York 10036

For Defendant: John C. Fisher, Esq., Special A.U.S.A.
United States Attorney's Office
Eastern District of New York
c/o SSA/OGC
601 East 12th Street, Room 965
Kansas City, Missouri 64106-2898

SEYBERT, District Judge:

Plaintiff Matthew L. Armstead, Jr. ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of his application for Social Security Disability Benefits by the Commissioner of Social Security (the "Commissioner"). (Compl., ECF No. 1.) Pending before the Court are the parties' cross-motions for judgment on the pleadings. (Pl. Mot., ECF No. 17; Pl. Support Memo, ECF No. 17-1; Comm'r X-Mot., ECF No. 20; Comm'r Support Memo, ECF No. 20-1; Pl. Reply, ECF No. 21; see also Admin. Tr., ECF No.

12.[1].) For the following reasons, Plaintiff's Motion is GRANTED, and the Commissioner's Cross-Motion is DENIED.

BACKGROUND[2]

I. Procedural History

On March 29, 2017, Plaintiff completed an application for disability insurance benefits alleging disability as of January 1, 2016 (hereafter, the "Onset Date"), due to spine disorder, affective disorder, posttraumatic-stress disorder ("PTSD"), and bilateral knee disorder. (R. 52.) After Plaintiff's claim was denied on May 19, 2017, he requested a hearing before an Administrative Law Judge ("ALJ"). (R. 52, 191-200.) On February 11, 2019, accompanied by counsel, Plaintiff appeared for a hearing before ALJ Benjamin Chaykin (hereafter, the "2019 Disability Hearing"). (R. 136-162.) Lisa Carey, a vocational expert ("VE"), testified at the hearing. (R. 52.)

In a March 20, 2019 decision, the ALJ found Plaintiff was not disabled. (R. 49-68.) On May 13, 2020, the Social Security Administration's Appeals Council denied Plaintiff's request for

[1] Hereafter, the Court shall cite to the Administrative Transcript as "R" and provide the relevant Bates Stamp number(s).

[2] The background is derived from the administrative record filed by the Commissioner on December 10, 2020. (See ECF No. 12.) For purposes of this Memorandum & Order, familiarity with the administrative record is presumed.

review, making the ALJ's decision the final decision of the Commissioner. (R. 1-7.)

Plaintiff initiated this action on June 26, 2020. (See Compl.) On April 12, 2021, Plaintiff moved for judgment on the pleadings. On July 7, 2021, the Commissioner cross-moved for judgment on the pleadings. On July 28, 2021, Plaintiff filed his reply. The Cross-Motions are ripe for decision.

II. Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimonial evidence and employment history before turning to his medical records and the VE's testimony.

A. Testimonial Evidence and Employment History

Plaintiff was born in 1990. (R. 142.) He completed his high school education and attended some college, but did not obtain a college degree. (R. 149.) At the time of the 2019 Disability Hearing, Plaintiff was 29-years-old and slept at his mother's apartment. (R. 142, 148.) He has a history of childhood sexual abuse by family members, which abuse began when he was seven or eight. (R. 343-46, 380-81.) Plaintiff also was hit by a car when he was in sixth grade, which caused traumatic brain injury. (R. 381.)

Plaintiff testified his friend usually picks him up at his mother's house in the morning and then they eat breakfast at the friend's house. (R. 148.) If the friend is not working, the

two will go for walks or play one-on-one basketball. (R. 149.) Plaintiff testified he viewed his friend as his second therapist who listens to his problems and gives him advice. (Id.) When his friend needs to go to work, he often drops off Plaintiff at Plaintiff's mother's job; Plaintiff will then sit in his mother's car waiting for her to finish work. (R. 148.)

At the time of the 2019 Disability Hearing, Plaintiff was not working. (R. 143.) From February 2011 to September 2012, Plaintiff worked at Access Staffing making sandwiches. (R. 147.) From November 2012 to January 2013, Plaintiff worked as a driver's helper cleaning up debris from Hurricane Sandy. (Id.) From July to November 2013, Plaintiff worked in an assembly line at Estee Lauder where he put caps on bottles and packaged items into boxes. (R. 297.) From November 2013 to July 2014, Plaintiff worked in inventory distribution where he counted boxes and organized shipments. (R. 295.) From July 2014 to August 2014, Plaintiff worked at Sneakers 4 U, where he gathered shoe orders and conducted quality control on the shoes. (R. 291, 296.) Also in 2014, Plaintiff worked as a butcher for three months. (R. 291.) For approximately one month in the beginning of 2015, Plaintiff worked in telemarketing. (Id.) From February 2015 to November 2015, Plaintiff did handyman work for Harris Corporation. (R. 291-92.) It was also during 2015 that Plaintiff worked for Contract Specialties Group, LTD, but because of his frequent absences, he

was eventually fired. (R. 150.) Plaintiff testified: he often called out because he was too overwhelmed by the work and the yelling from his coworkers (id.); and, he struggled to concentrate and maintain pace at this job. (Id.) In 2017, Plaintiff attempted working at a DXL Store folding clothes. (R. 144.) However, he worked there for one day only because he found it too overwhelming. (Id.) Plaintiff testified he was criticized for incorrectly folding clothes, which criticism was overwhelming. (Id.) The next time Plaintiff worked was in 2018; he worked for a week helping a friend with cleaning houses. (R. 143-44.) However, Plaintiff: could not keep up with the pace of the job; felt overwhelmed; and, was uncomfortable being in another person's home. (R. 144.)

Plaintiff began struggling with his mental health after he was laid off in 2015. (R. 145.) Throughout that year, Plaintiff felt he was a failure and became suicidal. (Id.) Eventually, in August 2016, he sought treatment at South Nassau Guidance Center ("Center"). (Id.) Since then, Plaintiff has been attending counseling sessions at the Center once a week; he testified he has experienced "up[s] and down[s]" in his symptoms, which have "not really" improved. (R. 145-46.)

According to Plaintiff, he suffers from depression, anxiety, and PTSD. (R. 152.) Plaintiff's daily anxiety causes him to feel: extreme pressure in his chest; as though he is going to have a heart attack; as though he has lost all control of his mind;

and, as though he wants to die. (R. 153.) Further, Plaintiff testified that being around his mother triggers his anxiety; likewise, being in her home surrounded by photos of the brother and cousins who molested him triggers Plaintiff's anxiety spells. (R. 153-54.) Plaintiff estimates he experiences "bad days" about three days per week; such days are when his symptoms are more severe. (R. 154.) During such days, Plaintiff isolates himself from others, finding it difficult to function normally; he will not answer his friend's phone calls, but will lock himself in his mother's room. (R. 154.) Plaintiff was suffering anxiety attacks through January 2019. (Id.) Additionally, he has trouble trusting others, believing they will hurt him if given the chance. (R. 152.)

Exacerbating his symptoms, Plaintiff also testified that he suffers from intense pain in his lower back and achiness in both his knees. (R. 156.) Pulling is also a struggle because of his back. (R. 157.) Additionally, Plaintiff struggles with sleeping because nightmares of his past trauma keep him up at night. (R. 151.) Plaintiff testified to getting no more than five hours a sleep on a good night, which occurs two-to-three nights per week. (Id.) Plaintiff is currently taking prazosin and citalopram to help him sleep. (Id.)

B. Plaintiff's Mental Health Medical History[3]

1. Treatment at the Center

a. Dr. Stephen Rayport's Treatment Notes

i. Initial Appointment and Assessment

Plaintiff began attending the Center on August 24, 2016, when he met with Amanda Marcus, LCSW ("LCWS Marcus"), and Dr. Stephen Rayport ("Dr. Rayport") to discuss his symptoms, since he could no longer "take it anymore" and needed "help talking and finally getting some closure." (R. 376, 386.) He reported being anxious and depressed all the time, which impeded his ability to maintain employment; he further explained, he took frequent bathroom breaks at work because of his anxiety. (R. 376.)

[3] While it is undisputed Plaintiff has physical impairments in addition to mental ones, since Plaintiff's action here focuses upon his mental impairments, the Court does likewise. Accordingly, no discussions of Plaintiff's physical impairments--including treatments thereof--are addressed herein. See, e.g., Grady v. Comm'r of Soc. Sec., No. 20-CV-3739, 2024 WL 4607231, at *2 n.3 (E.D.N.Y. Oct. 28, 2024) (where claimant did not challenge ALJ's findings regarding claimant's physical limitations, focusing discussion on claimant's mental impairments); see also Rodriguez v. Comm'r of Soc. Sec., No. 22-CV-10665, 2024 WL 1342834, at *2 (S.D.N.Y. Mar. 29, 2024) (same); Navedo v. Kijakazi, 616 F. Supp. 3d 332, 346 n.6 (N.D.N.Y. 2022)("[B]ecause [plaintiff] does not dispute the ALJ's findings regrading her physical impairments in this appeal, the medical evidence discussed in this opinion focuses only on [plaintiff]'s mental impairments." (internal quotations and citation omitted)).

For convenience, the Court notes generally: Plaintiff's physical impairments include a spine disorder and a bilateral knee disorder. (R. 55.) He also suffered serious head trauma as the result of being hit by a vehicle when he was in the sixth grade. (R. 345, 381.) As a result, Plaintiff has residual joint pain and suffers from migraines and headaches. (R. 381.)

Plaintiff also stated several family members molested him at a young age, and his father left when he was young. (Id.) Conversely, Plaintiff reported a strong relationship with his mother. (R. 380.)

Continuing, Plaintiff reported, when he was in the sixth grade, a friend pushed him in front of a car, which hit him. (R. 376.) Due to the car accident, Plaintiff suffered a traumatic brain injury and short-term memory loss. (R. 381.) Plaintiff also stated his belief that the car accident exacerbated his depression. (R. 376.) He told LCWS Marcus and Dr. Rayport he has had suicidal thoughts and regretted not dying in the car accident. (R. 382.)

Plaintiff also noted struggling with sleeping because of flashback nightmares. (R. 376.) He further reported: sleeping only two-to-three hours per night; having low energy; spending a great deal of time in the dark; and, having a poor appetite. (Id.) Overall, Plaintiff believed his poor mental health was a barrier to achieving his goals; for example, it prevented him from going out in public. (R. 383-84.) He stated: "Mentally[,] it's like I'm not there at all, like I'm gone." (R. 384.) To combat his depression and anxiety, Plaintiff stated he engaged in several activities, such as: watching documentaries about depression; journaling; riding his bicycle; and, listening to music. (R. 383.)

In their Comprehensive Assessment, LCSW Marcus and Dr. Rayport diagnosed Plaintiff with Major Depressive Disorder ("MDD")

that was severe, recurrent, and without psychotic features. (R. 385.) They further diagnosed Plaintiff with PTSD. (Id.). Their diagnoses also included Plaintiff: having "[s]leep paralysis"; having "[v]ocational problems"; experiencing "[p]roblems related to primary support system"; experiencing "[i]nterpersonal avoidance"; and suffering traumas from his car accident and sexual abuse. (Id.)

ii. Subsequent Appointments with Dr. Rayport

Plaintiff next met with Dr. Rayport on April 5, 2018. (R. 469.) Among other physical ailments, Plaintiff reported having gone for a sleep study and being diagnosed with sleep apnea. (Id.) Dr. Rayport noted Plaintiff was still suffering from flashbacks a couple times per week. (R. 468.) He also reported, inter alia, Plaintiff had: a neat appearance; a stressed mood; no formal thought disorder; full cognition; and, excellent insight and judgment. (Id.) Dr. Rayport confirmed Plaintiff's MDD and PTSD diagnoses. (R. 469.)

On September 22, 2018, Plaintiff has another appointment with Dr. Rayport, during which Plaintiff reported "things have been rough." (R. 562.) In sum, due to his mother's changed financial circumstances, Plaintiff was "[e]ffectively homeless". (R. 562, 565.) Significantly, Plaintiff continued to report symptoms of depression and PTSD. (R. 563, 565.) Plaintiff's mood and affect were depressed and anxious; he continues to have passive

suicidal thoughts. (R. 563.) Dr. Rayport noted Plaintiff reporting he "goes to sleep with the blissful thought that he won't wake up in the morning and then is depressed when he does." (Id.) Plaintiff also informed the Doctor he had ran out of his medications two weeks prior to the September 2018 appointment, which worsened his symptoms. (R. 563.) Dr. Rayport renewed Plaintiff's prescriptions for Celexa, Klonopin, and Hydroxyzine. (R. 565-66.)

b. Notes of Annamarie Goldblatt, PMNHNP-BC[4]

Plaintiff first met with Annmarie Goldblatt, PMHNP-BC ("Goldblatt"), on October 13, 2016. (R. 393.) At that time, Plaintiff reported having prior passive thoughts of suicide, but he had no intention or plan to act upon them. (R. 389.) Noting he was still close with a friend from middle school, Goldblatt developed a plan for Plaintiff to talk to that friend if Plaintiff developed suicidal thoughts in the future. (R. 389-90.) Goldblatt also observed, inter alia, Plaintiff: was clean and neat; held good eye contact; and, presented with a calm mood, but blunted affect. (R. 391.) Plaintiff denied having auditory verbal hallucinations, mood swings, and paranoia. (Id.) His cognitive function was fair; his thought processes were concrete; and, his

[4] "PMNHNP-BC" is an acronym for a Board Certified Psychiatric-Mental Health Nurse Practitioner. See, e.g., https://www.nursingworld.org/our-certifications/psychiatric-mental-health-nurse-practitioner/ (last visited Nov. 20, 2024).

insight and judgment were within normal limits. (Id.) Goldblatt found Plaintiff met the criteria for MDD, i.e., was depressed; had low energy and motivation; had a poor appetite; and, exhibited a lack of interest. (Id.) She also concluded Plaintiff showed signs of chronic PTSD, i.e., flashbacks; nightmares; hypervigilance; feeling out of himself and ambivalent; and, having difficulty with relationships. (Id.)

Plaintiff next met with Goldblatt on April 25, 2017. (R. 399-402.) Plaintiff continued to complain of depression and anxiety. (R. 399.) He reported isolating himself to avoid being around others. (Id.) Goldblatt noted Plaintiff experienced: uncomfortability being around family members who abused him; feeling empty; having trouble falling asleep; and, sleeping four-to-six hours per night. (Id.) Goldblatt reported a notable change in Plaintiff's mood and affect, describing them as "'empty' affect dysphoric, timid"; all other identified conditions showed no significant changes. (Id.) Plaintiff denied having suicidal ideations. (Id.)

Goldblatt met again with Plaintiff on May 9, 2017, for a medication and symptom update. (R. 395-98.) She reported Plaintiff continued to isolate himself and felt uncomfortable around people. (R. 395.) Goldblatt once more highlighted Plaintiff's mood and affect was "notable", describing same as "'numb' affect dysphoric" and "timid", with other identified

conditions continuing to exhibit no significant changes. (Id.) Plaintiff continued to deny auditory visual hallucinations and paranoia, and he did not report any suicidal thoughts or ideations. (Id.) His appetite remained unchanged. (Id.) Goldblatt did not change Plaintiff's medications, i.e., Citalopram, Mirtazapine, Hydroxyzine, and Remcron, but altered dosages to avoid lethargy and help with his anxiety. (R.396, 398.)

c. Treatment Notes of Sean Thomas, NPP[5]

On January 16, 2018, Plaintiff had another session at the Center, this time with NPP Sean Thomas ("Thomas"). (R. 444.) Thomas noted Plaintiff was experiencing increased anxiety because family members who had molested him were visiting. (Id.) He further recorded Plaintiff having missed his last medication appointment; therefore, Plaintiff had been without Celexa for six days. (Id.) Thomas prescribed a daily dosage of Klonopin to improve Plaintiff's anxiety, and Plaintiff reported the increased dosage of Prazosin helped with his night terrors. (Id.) Thomas reported no significant changes in Plaintiff's appearance,

---

[5] "NPP" is an acronym for a Nonphysician Practitioner. See, e.g., https://www.aapc.com/resourcs/what-is-a-nonphysician-practitioner-npp; see also, e.g., clarifyhealth.com/insights/healthcare-acronyms/npp/ ("Nonphysician Practitioner (NPP) refers to healthcare providers who are not physicians but who perform some of the same care typically provided by a physician. They may include nurse practitioners, physician assistants, and clinical nurse specialists.").

behavior, mood and affect, speech, thought process, thought content, cognition, insight, or judgment. (Id.)

Plaintiff next met with Thomas at the Center on June 5, 2018. (R. 466.) Plaintiff relayed that, due to a family event, many of his cousins would be visiting, which visit was increasing Plaintiff's anxiety since the visit brought up bad memories of the abuse Plaintiff suffered at the hands of his brother. (R. 464.) Thomas noted Plaintiff had been without medication for the prior three weeks, having run out of them. (Id.) Thomas re-filled Plaintiff's prescriptions for Celexa, Klonopin, and Vistaril. (R. 466.) Thomas also found notable Plaintiff's mood, which was "down, sluggish", and affect, which was "flat". (R. 464.)

d. Treatment Notes of Dina Macaluso, LMSW

On January 30, 2018, Dina Macaluso, LMSW ("Macaluso"), completed a medical source statement of Plaintiff's ability to do work-related activities. (R. 456.) Macaluso first opined Plaintiff had marked limitations in the following categories: (1) understanding and remembering simple instructions; (2) carrying out simple instructions; (3) carrying out complex instructions; and (4) having the ability to make judgments on complex work-related decisions. (Id.) Additionally, Macaluso reported Plaintiff had extreme limitations in his ability to understand and remember complex instructions. (Id.) Supporting her assessment, Macaluso stated Plaintiff "has experienced a lot of trauma as well

as suffered a head injury from being hit by a car." (Id.) Macaluso opined Plaintiff also had extreme limitations in his ability to interact appropriately with the public, with supervisors, and with co-workers, as well as in responding appropriately to usual work situations and to changes in a routine work setting. (R. 457.) Macaluso explained Plaintiff's past trauma has led him to be uncomfortable around others and to be anxious. (Id.) Finally, Macaluso opined Plaintiff's anxiety causes him to panic, which interferes with his abilities to concentrate. (Id.)

On September 13, 2018, Plaintiff had a progress meeting with Macaluso. (R. 539-50.) Plaintiff reported symptoms of: depression; PTSD; low energy; poor appetite; difficulty concentrating; hopelessness; history of suicidal ideation; difficulty sleeping; little interest in activities; frequent intrusive thoughts; flashbacks; and, nightmares. (R. 539.) He also presented with suicidal ideation due to increased anxiety caused by a recent move; Plaintiff relayed almost running into a car but stopping himself when he realized what he was doing. (Id.) Macaluso noted Plaintiff's means of addressing his anxiety were, inter alia: playing basketball and visiting the gym; meditating and practicing yoga; journaling; and, socialized when he felt able. (Id.) She noted Plaintiff attended therapy on a weekly basis and was an active participant. (R. 541.) Macaluso reported Plaintiff still struggled with identifying his triggers and the warning signs

of his symptoms; she reviewed a safety plan with him to use when he was experiencing symptoms. (R. 542.) Moreover, Macaluso found Plaintiff's PTSD symptoms were present daily, with his symptoms of depression at the forefront. (R. 544.) She noted Plaintiff continued to complain about his sleep struggles notwithstanding using his CPAP machine. (Id.) Further, while Plaintiff took medications to help with his symptoms, he was not taking them consistently. (R. 548.) Macaluso affirmed Plaintiff's MDD and PTSD diagnoses. (R. 549.)

On November 20, 2018, Plaintiff met with Macaluso again; they developed a safety plan if Plaintiff began to develop thoughts of suicide. (R. 578.) The plan was, should he begin to experience certain stressors, e.g., interactions with his mother or seeing pictures of his brother, Plaintiff could: write; exercise or go for a walk; reach out to friends; and/or listen to music. (Id.)

Plaintiff met with Macaluso again on December 10, 2018. (R. 527-38.) She reported Plaintiff was: experiencing continuing suicidal ideations; continuing to deal with his symptoms of depression and PTSD; and, continuing to work on identifying his triggers. (R. 527.) As to his triggers, Plaintiff reported socializing and the lack of structure in his life were triggers. (Id.) Plaintiff complained the state of his mental health and his fear of going outside were impediments to his goals of identifying his triggers and establishing effective coping skills. (R. 527-

28.) In that vein, Macaluso reported certain socialization activities caused Plaintiff to experience flashbacks. (R. 532, 534.) She stated Plaintiff used his therapy sessions and medication to manage his symptoms. (R. 533.) Macaluso noted Plaintiff was being more compliant with his medications. (R. 536.)

On January 8, 2019, Macaluso completed a second medical source statement regarding Plaintiff's ability to do work-related activities. (R. 581-83.) She first opined Plaintiff had marked limitations in his ability to carry out simple instructions and in his ability to makes judgments on simple work-related decisions. (R. 581.) She then reported Plaintiff had extreme limitations in the following categories: (1) understanding and remembering simple and complex instructions; (2) carrying out complex instructions; and (3) making judgments on complex work-related decisions. (Id.) Macaluso explained Plaintiff could not remember "even the simplest instructions", and his symptoms kept him preoccupied. (Id.) She also stated Plaintiff had a history of being unable to carry out tasks at work and received several write-ups due to his behavior. (Id.)

Regarding his ability to interact appropriately with others, Macaluso opined Plaintiff's impairments extremely limited such ability as to: the public; supervisors; and, co-workers. (R. 582.) Likewise, Plaintiff's impairments extremely limited his ability to respond appropriately to usual work situations and to

changes in a routine work setting. (Id.) Macaluso elucidated that Plaintiff's childhood abuse caused him to feel uncomfortable around others. (Id.) She believed Plaintiff would struggle in settings requiring interaction with others because such settings would trigger flashbacks. (Id.) Macaluso further opined Plaintiff's panic attacks would cause him to take excessive bathroom breaks. (Id.) She also explained Plaintiff's symptoms negatively affected his punctuality and attendance, which would hamper his attendance. (Id.) Moreover, Plaintiff was no longer comfortable driving, which would also hinder his attendance. (Id.)

e. Treatment Notes of Valreen Hinds, DNP,[6] PMHNP-BC

Between appointments with Macalusco, Plaintiff had a July 12, 2018 visit to the Center for follow-up medication management; Plaintiff saw Valreen Hinds, DNP, PMHNP-BC (hereafter, "Hinds"). (R. 461.) At that time, Plaintiff reported his anxiety continued to fluctuate. (Id.) Hinds noted the day was particularly tough for Plaintiff because his brother, who had molested him, was getting married and Plaintiff was not attending. (Id.) Hinds reported Plaintiff's mood as sad and his affect as constricted, but he was not experiencing suicidal thoughts. (Id.) Hinds

[6] "DNP" signifies a Doctor of Nursing Practice; a DNP degree is the "high[est] level of education available for practice-based training in nursing." See Degrees: What Is a DNP and Is It Worth It? (June 5, 2024), available at https://nurse.org/articles/how-to-get-a-dnp-is-it-worth-it/ (last visited Nov. 21, 2024).

instructed Plaintiff to continue his medications, with which he was not being compliant; no explanation was given for said non-compliance. (R. 461, 463.)

f. Treatment Notes of Anne Saunders, NPP

Plaintiff also met with Anne Saunders, NPP (hereafter, "Saunders"), at the Center. (R. 557-61.) On November 6, 2018, Saunders found Plaintiff's appearance, speech, cognition, and insight and judgment were unremarkable. (R. 557-58.) However, she found notable Plaintiff's mood, which was anxious, and that Plaintiff was distressed by nightmares, which woke him up. (R. 557.) Saunders also highlighted Plaintiff had intrusive suicidal ideations for years, but without any plan or intent to act upon them. (R. 558.) Plaintiff was taking his medications as prescribed; Saunders maintained Plaintiff's prescriptions for Celexa, Klonopin, and Hyrdoxyzine. (R. 558, 559.) Plaintiff's diagnoses of MDD and PTSD were also noted within the record. (R. 560.)

Thereafter, on November 27, 2018, Plaintiff had another session with Saunders. (R. 551-56.) Saunders noted Plaintiff was not working because of his depression and PTSD symptoms. (R. 551.) Plaintiff reported waking up, at least once a week, in the middle of the night feeling tingling in his extremities and experiencing shortness of breath. (Id.) Saunders discussed the nightmares with Plaintiff and emphasized the need for sleep hygiene. (Id.)

Plaintiff continued to take his medications but vocalized his uncertainty about the effectiveness of Celexa. (Id.) Of note, Plaintiff's mood was depressed, and his affect was anxious. (R. 552.) He was not experiencing suicidal ideations. (Id.) Saunders suggested Plaintiff consider taking an online course, to which idea Plaintiff was receptive. (R. 555.) There was no change in Plaintiff's diagnoses of major depression and PTSD. (R. 555.)

In her notes regarding Plaintiff's December 18, 2018 visit to the Center, Saunders stated Plaintiff reported an improved mood, i.e., he was "less depressed at times". (R. 522, 523.) Yet, his affect remained anxious. (R. 523.) Plaintiff continued to report symptoms of depression and PTSD. (R. 524.) Further, Plaintiff claimed he suffered from: low energy; a depressed mood; poor appetite; difficulty concentrating; and, hopelessness and little interest in activities. (Id.) He also continued to experience sleeping difficulties and nightmares, as well as frequent intrusive thoughts and flashbacks. (Id.) Saunders did not report any changes to Plaintiff's medication or diagnoses. (R. 524-25.)

2. D.O. Anthony F. Adamo's Treatment Notes

On October 27, 2016, Plaintiff visited Anthony Adamo, D.O. ("Dr. Adamo"), of Nassau Suffolk Neurology, P.C., for a neurology visit. (R. 427.) Plaintiff's primary complaint was poor sleeping, stating he did not feel well-rested and wakes up multiple

times throughout the night. (Id.) Dr. Adamo noted Plaintiff may have an underlying sleep disorder, but a brain MRI and EEG would be necessary. (R. 429.) A subsequent brain MRI presented as normal (R. 425.) However, Plaintiff presented an abnormal awake/drowsy EEG due to background slowing. (R. 421-22.)

At his follow-up November 17, 2016 appointment with Dr. Adamo, Plaintiff complained of some insomnia with daytime somnolence. (R. 418.) Dr. Adamo noted no new neurological symptoms, but Plaintiff presented with mild dizziness. (Id.) The Doctor suggested a sleep evaluation should be scheduled. (R. 420.)

On April 13, 2017, Plaintiff again visited Dr. Adamo. (R. 415.) Plaintiff denied any daytime sleeping attacks, but had general somnolence, hypnagogic hallucinations, and sleep paralysis. (Id.) During the April 2017 visit, among other things, the Doctor found Plaintiff's affect was pleasant and cooperative. (R. 416.) He again recommended a sleep evaluation because the Plaintiff had many features consistent with narcolepsy. (R. 415.) Plaintiff's dizziness and giddiness, encephalopathy, and peripheral vertigo remained unchanged from prior visits. (R. 417.)

Plaintiff's next appointment with Dr. Adamo was on September 28, 2017. (R. 412.) Plaintiff's reported symptoms were unchanged. (R. 412, 414.) So, too, was Plaintiff's mental status. (R. 413.) Once more, the Doctor recommended a sleep study

evaluation to investigate Plaintiff's daytime somnolence; a re-evaluation would be required thereafter. (R. 414.)

3. Consultative Examiner Dr. Kathleen Acer's Treatment Notes

On May 10, 2017, consultative examiner Kathleen Acer, Ph.D. ("Dr. Acer"), conducted a psychiatric evaluation of the Plaintiff. (R. 405.) Among other things, her evaluation included Plaintiff's history and background information, e.g.: he is unable to work due to physical and psychiatric issues; as an adult, Plaintiff began counseling in August 2016; he attends counseling weekly and sees a psychiatrist monthly; and, he is on various prescription medications. (Id.).

As to Plaintiff's current functioning capacity, Dr. Acer reported, Plaintiff: had difficulty falling and staying asleep; had ongoing and daily depressed moods; felt hopelessness about the future; suffered from fatigue and lacked energy and motivation. (R. 405.) Further, Plaintiff: was socially withdrawn; avoided interacting with others because it caused him a great deal of anxiety; had trouble focusing and concentrating; and, experienced ongoing nightmares and flashbacks of his molestation and car accident. (Id.) Continuing, the Doctor noted Plaintiff felt emotionally numb, and was frequently anxious, nervous, restless, jittery, tense, overwhelmed, and stressed. (Id.) Moreover, Plaintiff suffered panic attacks several times a week accompanied

by palpitations, sweating, dizziness, breathing difficulties, trembling, and shaking. (Id.) Said attacks generally occured when Plaintiff was in public situations; therefore, Plaintiff would avoid leaving the house whenever possible. (R. 405-06.) However, he did not present with any suicidal ideations or mania. (R. 406.)

Dr. Acer conducted a mental assessment of Plaintiff during which he was cooperative, but anxious. (R. 406.) While presenting appropriately and neatly groomed, Plaintiff's posture was tense and restless throughout the evaluation. (Id.) Further, although, Plaintiff was coherent, goal directed, and presented no evidence of hallucinations, delusions, or paranoia, his mood and affect were anxious, while his sensorium was clear. (Id.) Throughout the evaluation, Plaintiff appeared alert with his attention and concentration intact. (Id.) Dr. Acer documented Plaintiff's cognition as average while his insight and judgment were fair. (R. 407.)

Regarding his mode of living, Dr. Acer reported Plaintiff could: dress, bathe, and groom himself; perform simple household chores such as taking out the garbage and washing the dishes; manage his finances; and, drive a vehicle. (R. 407, 408.) She also stated Plaintiff had an adequate relationship with his mother, but did not interact with other family members. (R. 407.) Dr. Acer noted Plaintiff spent his days watching television, lying around the house, and listening to music. (Id.)

Dr. Acer also provided a medical source statement describing Plaintiff's vocational capacity, i.e., there was no evidence of a limitation in Plaintiff's ability to understand, remember, or apply simple or complex instructions and directions or to use reason and judgment. (Id.) However, Dr. Acer reported Plaintiff would have marked limitations in: adequately interacting with supervisors, coworkers, and the public; sustaining an ordinary routine; and, regulating emotions. (Id.) She stated the results of her evaluation "appear to be consistent with psychiatric issues which may hinder functioning." (Id.) Dr. Acer diagnosed Plaintiff with MDD, PTSD, panic disorder, and agoraphobia. (Id.) She recommended continued psychiatric and psychological treatment, concluding that Plaintiff's prognosis was fair. (R. 408.)

4. Evaluation by K. Lieber-Diaz, Psy.D.[7]

On May 19, 2017, Dr. Kimberly Lieber-Diaz (hereafter, the "Consultant" or "Lieber-Diaz") conducted an initial disability determination of the Plaintiff. (R. 165-177.) "Consultant Lieber-Diaz reviewed some (but not all) of [Plaintiff]'s medical records," and "never examined [Plaintiff]." (Support Memo at 18.) According

[7] The acronym "Psy.D." stands for Doctor of Psychology. See LIU Post: Psy.D vs Ph.D, available at https://liu.edu/post/academics/school-of-health-professions/programs/doctor-of-psychology/psyd-vs-phd (last viewed Dec. 2, 2024). It is "similar to the Ph.D. (Doctor of Philosophy) and the Ed.D. (Doctor of Education) in academic standing" but with a greater focus on clinical training. Id.

to the Consultant's review, Plaintiff: had a normal appearance; was cooperative and calm; had a blunted affect; could not do serial sevens, but could do serial fours; and, had a concrete though process. (R. 169.) She reported Plaintiff's mental status examination was notable for dysphoric and timid mood, but otherwise was within normal limits. (Id.) The Consultant opined Plaintiff had a moderate limitation in his ability to interact with others and mild limitations in his abilities to: understand, remember, or apply information; concentrate, persist, or maintain pace; and, adapt or manage himself. (R. 170.) Based upon the evidence presented, Consultant Lieber-Diaz concluded Plaintiff was not disabled and would be limited to jobs requiring minimal contact with others. (R. 175; R. 177.)

C. The VE's Testimony

At Plaintiff's 2019 Disability Hearing, when asked to consider a hypothetical individual with Plaintiff's vocational profile and residual functional capacity ("RFC"), the VE testified such an individual would not be capable of performing any of Plaintiff's past work. (R. 159.) However, the VE also testified the hypothetical individual would be able to work as a garment sorter, a price maker, or as a non-postal mail clerk. (R. 159-60.) When the ALJ added the further limitations that the hypothetical individual could perform only simple, routine tasks which did not involve teamwork or tandem tasks, the VE testified that such

limitations would not prevent said individual from performing the above-mentioned jobs. (R. 160.) However, with the additional limitations that the hypothetical individual would be off task for more than 15 percent of the workday or would be absent from work at least two days a month, the VE testified either of those limitations would preclude employment for said individual (Id.)

DISCUSSION

I. Standard of Review, Generally

When reviewing a final decision of the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Rucker v. Kijakazi, 48 F.4th 86, 90-91 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)). District courts will overturn an ALJ's decision only if the ALJ applied an incorrect legal standard, or if the ALJ's ruling was not supported by substantial evidence. Id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)). "[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

II. The ALJ's Decision and the Five-Step Disability Analysis

First, the ALJ found Plaintiff meets the insured status requirements through March 31, 2019. (R 54.) The ALJ then applied the five-step disability analysis and concluded Plaintiff was not disabled from his Onset Date through the date of his March 20, 2019 decision (hereafter, the "March 2019 Decision" (R.52-63)). (R. 53, 63); see also 20 C.F.R. § 404.1520.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged Onset Date; indeed, while Plaintiff had worked since the alleged Onset Date, such work did not rise to the level of substantial gainful activity. (R. 54.)

At step two, the ALJ determined Plaintiff had severe impairments consisting of, inter alia: an affective disorder; anxiety disorder; and, PTSD. (R. 55.) The ALJ stated those impairments "significantly limit the ability to perform basic work activities." (Id. (citing SSR 85-28).)

At step three, the ALJ determined Plaintiff's impairments or combination thereof did not meet or medically equal the severity "of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1" of the Social Security regulations because, considered singly or in combination, the severity of Plaintiff's mental impairments "d[id] not meet or medically equal the criteria of listings 12.04 and 12.06". (Id.) The ALJ's finding was based

upon the "'paragraph B' criteria", which considers the impact of a claimant's mental impairments in four categories: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) managing himself. (Id.)

As to Category One: The ALJ explained Plaintiff's abilities for understanding, remembering, or applying information was mildly limited based upon his "typical activities including being able to drive, spend time with a friend, watch television, and listen to music" as well as a mental status examination showing intact recent and remote memory skills. (R. 56 (citing Dr. Acer's 2017 Evaluation).) As to Category Two: The ALJ found Plaintiff had a moderate limitation in his ability to interact with others because, "on a typical day", he would "call a friend to pick him up so he does not have to stay at home alone" or "[h]e may go for walks and talk with his friend, go to the gym, or play basketball." (Id. (emphasis added).) Further, Plaintiff was "able to shop in the grocery store by going early, and can used shared transportation to appointments." (Id. (emphasis added).) As to Category Three: The ALJ further determined Plaintiff was moderately limited regarding concentration, persistence, and maintenance-of-pace. (Id.) The ALJ based this assessment upon Plaintiff being able to clean, watch television, and read, as well as engaging in daily activities of simple household chores,

managing his finances, driving and listening to music. (Id.) Moreover, he relied upon Dr. Acer's examination to conclude Plaintiff had "intact attention and concentration. (Id. (citing Dr. Acer's 2017 Evaluation).) As to Category Four: The ALJ found Plaintiff had a moderate limitation in his ability to interact with others. (Id.) This finding was premised upon Plaintiff's purported ability to independently manage certain daily activities, "including household chores, watching television, listening to music, and spending time with others," notwithstanding the ALJ's acknowledgement regarding Plaintiff's testimony that, several times per week, he would isolate himself when his anxiety worsened and being uncomfortable around others. (Id. (citing Dr. Acer's 2017 Evaluation).) At bottom, because he found Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the ALJ further found Plaintiff did not satisfy the "paragraph B" criteria. (Id.) Moreover, as to the alternative "paragraph C" criteria, in a perfunctory manner, the ALJ stated "[t]he record does not establish he has only . . . a minimal capacity to adapt to changes in his environment or to demands that are not already part of [his] daily life," since he "can shop" and "spend time with others". (Id.)

The ALJ proceeded to assess Plaintiff's residual functional capacity ("RFC"), concluding Plaintiff's RFC was for light work, with certain physical limitations, as well as the non-

physical limitations of being limited to "simple, routine tasks, but no teamwork or tandem tasks" and "occasional interaction with supervisors, co-workers, and the public." (R. 57.) To support his RFC determination, the ALJ stated he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Id.)

Specific to Plaintiff's mental impairments, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 58.) Notwithstanding Plaintiff having "reported a difficult[] history, including childhood trauma, and ongoing mental health treatment including weekly therapy and monthly medication management," the ALJ found "his level of current functioning appear[ed to be] greater than alleged." (Id. (internal citation omitted).) In making this finding, the ALJ relied upon the following. First, based upon the 2017 Consultative Exam, the ALJ highlighted Plaintiff had been able to drive himself to that 2017 Exam. (Id.) The ALJ further underscored, while Plaintiff had some counseling in high school, he did not start treatment as an adult until August 2016. (Id.) Second, based upon an unidentified

mental status exam, Plaintiff exhibited, inter alia: fluent and clear speech; coherent and goal directed thought processes; a clear sensorium; good orientation; intact attention, concentration, and recent and remote memory skills. (Id.) However, while there was no evidence Plaintiff suffered from hallucinations, delusions or paranoia, his affect and mood were anxious. (Id.) Third, based upon the April 13, 2017 treatment notes of Dr. Adamo, the ALJ found Plaintiff's mental health status "mostly unremarkable, with normal attention and concentration, and intact recent and remote memory." (R. 59 (citing Apr. 13, 2017 treatment notes of neurologist Dr. Adamo[8] (R. 519-21)[9]).) Finally, the ALJ also noted what appeared "to be a period of missing treatment, though [Plaintiff] did attend psychotherapy sessions later in 2018." (Id.) At bottom, the ALJ found Plaintiff's "mental impairments, related to symptoms of PTSD, depression, and anxiety, would cause limitations to simple, routine tasks, with limited interaction with others, due to difficulties with social functioning," but "[w]ork-preclusive impairments [we]re not shown." (Id.)

---

[8] Identified as Ex. No. 18F in the Administrative Transcript.

[9] Plaintiff's April 13, 2017 visit to Dr. Adamo was an office neurology visit. (R. 519.) Its purpose was to evaluate Plaintiff's complaints of dizziness. (Id.) Dr. Adamo had previously "recommended [a] sleep evaluation as [Plaintiff] has many features consistent with narcolepsy." (Id.)

The ALJ elucidated. He found partially persuasive the Consultant's opinion; he agreed Plaintiff is "limited to jobs requiring minimal contact with supervisors, co-workers, and the general public", but given further consideration of Plaintiff's subjective complaints and other opinions and treatment evidence in the record, "further moderate limitations in concentration, persistence, and pace, and adaptive functioning, are more supportable by the overall evidence." (R. 60.) But, the ALJ continued that unidentified "objective mental status examination findings are not consistent with work-preclusive limitations." (Id.) By way of rationale, the ALJ underscored Plaintiff did not require inpatient treatment for any of his mental health conditions; moreover, Plaintiff was "able to drive to some extent, shop in stores while avoiding crowds, and play basketball with a friend, or others occasionally." (Id.) He further highlighted a period of 'very limited and sporadic treatment between August 2016 and summer 2018, when treatment notes indicate regular attendance again." (Id.)

Conversely, the ALJ found LMSW Macaluso's January 2018 and January 2019 opinions that Plaintiff had moderate to extreme limitations in mental functioning to be unpersuasive, summarily asserting they were "not well supported by the overall evidence" and "not consistent with objective findings in the record." (R. 60.) Once more, apparently by way of further rationalization, the

ALJ underscored Plaintiff's "lack of inpatient treatment during the relevant period" and his "reported activities of daily living." (Id.)

Similarly, the ALJ discounted the opinion of Dr. Acer, who opined Plaintiff "ha[d] marked limitations in interacting with others, sustaining a routine, and regulating emotions," but showed "no evidence in limitations in ability to understand, remember, or apply simple or complex instructions and directions, or use reason and judgment." (R.61.) Contrary to Dr. Acer, the ALJ found "the overall evidence does not support greater than the moderate limitations noted [by the ALJ's findings], and supports mild limitations in understanding, remembering or applying information." (Id.) Moreover, Dr. Acer's opinion was based upon "a one-time examination, and appears to be based mostly on [Plaintiff]'s subjective complaints." (Id.) The ALJ characterized Dr. Acer's limitations as "not consistent with objective findings in the record", as well as reiterated Plaintiff's "lack of inpatient treatment . . . and reported activities of daily living." (Id.)

Thereafter, at step four, the ALJ concluded the demands of Plaintiff's past relevant work exceeded his RFC for unskilled light work and Plaintiff was "unable to perform past relevant work as actually or generally performed." (R. 61.) However, based upon Plaintiff's age, education, work experience, and RFC, at step

five, the ALJ determined jobs existing in significant numbers in the national economy were available that Plaintiff could perform. (R. 62.) Yet, because of Plaintiff's limitations, and purportedly relying upon the VE's testimony, the ALJ narrowed the scope of available jobs Plaintiff could perform to a garment sorter, a price maker, and a non-postal mail clerk. (Id.) Hence, the ALJ determined Plaintiff was not disabled. (R. 63.)

III. Analysis

A. The Parties' Positions

Plaintiff advances two related arguments on appeal: (1) focusing on the "paragraph B" criteria, the ALJ improperly evaluated Plaintiff's mental impairments (Pl. Support Memo at 15-16); and, (2) the ALJ's RFC assessment was not supported by substantial evidence. (Id. at 16-18). In opposition, the Commissioner contends: (a) focusing on the "paragraph B" criteria, Plaintiff's engagement in daily living activities, as well as the absence of him having any inpatient treatment, evidenced moderate and mild limitations only and, therefore, did not rise to the level of establishing those criteria (Comm'r Support Memo at 13-16); and (b) again, underscoring his daily living activities, and that Plaintiff's "treatment during the relevant period consisted only of therapy and medication management", there was sufficient evidence supporting the ALJ's determination of non-disability (id. at 17-20).

B. Relevant Law

It is well-established:

> Social Security proceedings are non-adversarial and the ALJ is obliged "to investigate the facts and develop the arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 111, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) (citation omitted). This obligation applies even if the claimant is represented by counsel. See, e.g., Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). The ALJ's duty to develop the record has been described as a "bedrock principle of Social Security law." Batista v. Barnhart, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (citing Brown v. Apfel, 174 F.3d 59 (2d Cir. 1999)).

Michelle C. v. Comm'r of Soc. Sec., No. 23-CV-7144, 2024 WL 1706000, at *5 (S.D.N.Y. Apr. 3, 2024), report and recommendation adopted, 2024 WL 1702127 (S.D.N.Y. Apr. 18, 2024). Moreover, it has been "consistently recognized that 'an ALJ has a heightened duty to develop the record when a claimant asserts a mental impairment.'" Id. at *6 (quoting Gabrielsen v. Colvin, No. 12-CV-5694, 2015 WL 4597548, at *4-5 (S.D.N.Y. July 30, 2015) (collecting cases)). Indeed, "[t]his 'heightened duty' derives from the fact that a claimant's mental illness may greatly impede an evaluator's assessment of a claimant's ability to function in the workplace, thus necessitating a more thorough review." Id. (quoting Piscope v. Colvin, 201 F. Supp. 3d 456, 462-63 (S.D.N.Y. 2016)).

Additionally,

> [f]or claims filed on or after March 27, 2017, [like here,] the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ will evaluate the persuasiveness of medical opinions and prior administrative medical findings using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. See id. §§ 404.1520c(c), 416.920c(c). Of those, the "factors of supportability . . . and consistency . . . are the most important factors." Id. §§ 404.1520c(b)(2), 416.920c(b)(2); see also Loucks v. Kijakazi, No. 21-1749, 2022 WL 2189293, at *1 (2d Cir. June 17, 2022).
>
> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. §§ 404.1520c(c)(1), 416.920c(c)(1). With respect to consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. §§ 404.1520c(c)(2), 416.920c(c)(2).

Lena Nicole H. v. Comm'r of Soc. Sec., No. 23-CV-0826, 2024 WL 4133819, at *5 (N.D.N.Y. July 30, 2024); see also, e.g., Michelle C., 2024 WL 1706000, at *5. The most relevant factors in determining the persuasiveness of medical findings are the supportability and consistency factors. See Acheampong v. Comm'r of Soc. Sec., 564 F. Supp. 3d 261, 266 (E.D.N.Y. 2021); see also Navedo, 616 F. Supp. 3d at 343 ("Under the new regulations, the ALJ must 'explain how he considered' both the supportability and consistency factors, as they are 'the most important factors.'" (quoting 20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2) (emphasis added); further citation omitted); Keli Ann D. v. Comm'r of Soc. Sec., No. 23-CV-0765, 2024 WL 3493274, at *5 (N.D.N.Y. July 22, 2024) ("The revised regulations for evaluating opinion evidence place substantial emphasis on both supportability and consistency and require the ALJ to explain the analysis of each of those factors." (emphasis added)). The failure to properly consider and apply the supportability and consistency factors are grounds for remand. See Schonfeld v. Comm'r of Soc. Sec., No. 21-CV-6053, 2023 WL 2625833, at *13 (S.D.N.Y Mar. 24, 2023); Navedo, 616 F. Supp. 3d at 344 (same; collecting cases).

While the treating physician rule is no longer in effect, courts in this district have held the factors under the new regulations "are very similar to the analysis under the old treating physician rule." Velasquez v. Kijakazi, No. 19-CV-9303,

2021 WL 4392986, at *20 (S.D.N.Y. Sept. 24, 2021) (collecting cases); Navedo, 616 F. Supp. 3d at 344 (same; quoting Velasquez); Cuevas v. Comm'r of Soc. Sec., No. 20-CV-0502, 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) ("[T]he essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar."). For example, when an ALJ considers the medical source's relationship with the claimant, the ALJ must consider: the length of the treating relationship; the frequency of examinations; the purpose of the treatment relationship; the extent of the treatment relationship; and the examining relationship. See 20 C.F.R. § 1520c(c)(3)(i)-(v).

C. The ALJ's Evaluation of Plaintiff's Mental Impairments

The Court first addresses the ALJ's step-three determination, which Plaintiff challenges, arguing it is not supported by substantial evidence. (See Pl. Support Memo at 15.). Plaintiff further contends "the ALJ appears to have relied on his own interpretation of the medical evidence," which "was error." (Reply at 5.) Here, upon review of the record, the Court cannot say there was such relevant evidence as a reasonable mind might accept as adequate to support the ALJ's conclusion. See, e.g., Lena Nicole H. v. Comm'r of Soc. Sec., No. 23-CV-0826, 2024 WL 4133819, at *9 (N.D.N.Y. July 30, 2024).

The ALJ's paragraph B criteria determination that Plaintiff was mildly limited in understanding, remembering and applying information, and was moderately limited in interacting with others; in concentrating, persisting, and maintaining pace; and in adapting and managing himself was purportedly based upon Dr. Acer's May 2017 psychiatric evaluation. (See R. 56 (citing Dr. Acer's Evaluation[10]).) Yet, review of said evaluation does not support the ALJ's finding; instead, as Plaintiff persuasively argues:

> [E]xaminer Acer opined [Plaintiff] had marked limitations adequately interacting with supervisors, co-workers, and the public, sustaining an ordinary routine, and regulating emotions. Moreover, the ALJ did not discuss the January 30, 2018 and the January 8, 2019 medical source statements from [Plaintiff]'s longtime therapist, LMSW Dina Macaluso. According to Ms. Macaluso, [Plaintiff] has experienced extreme trauma and interaction with others that usually triggers flashbacks of his prior trauma. In her January 30, 2018 medical source statement, Ms. Macaluso opined [Plaintiff] was extremely limited in his ability to interact appropriately with supervisors, co-workers and the public and respond appropriately to usual work situations and to changes in a routine work setting and he was markedly limited in his ability to understand, remember, and carry out simple instructions. In her January 2019 medical source statement, Ms. Macaluso opined [Plaintiff] was extremely limited in his ability to understand and remember simple instructions, in addition to the limitation she found in January 2018.

[10] Identified as Ex. No. 6F in the Administrative Transcript.

(Pl. Support Memo at 15-16 (internal citations omitted; emphases added).) Further, Plaintiff accurately contends: "Ms. Macaluso's opinion is supported by, and consistent with, [E]xaminer Acer's opinion that [Plaintiff] has marked limitations adequately interacting with supervisors, co-workers, and the public, sustaining an ordinary routine, and regulating emotions," with Dr. Acer further opining Plaintiff's "psychiatric issues may hinder his functioning." (Reply at 4-5 (internal citations omitted).) To the extent the ALJ found Macaluso's opinions unpersuasive because it is not supported by the overall evidence, such conclusion is belied by the record, especially having considered Dr. Acer's comparable evaluation. See Ron I. v. Comm'r of Soc. Sec., No. 23-CV-0489, 2024 WL 4678398, at *9 (D. Vt. Nov. 4, 2024) (remanding case where ALJ discredited opinion of treating medical source whose opinion ALJ stated, without explanation, was inconsistent with overall record). Indeed, the ALJ failed to meaningfully address the supportability and consistency factors in arriving at his determination; such failure warrants remand. See, e.g., Navedo, 616 F. Supp. 3d at 343 (stating an ALJ must explain how he considers both supportability and consistency facts, because they are the most important factors (citations omitted)); see also id. at 344 (stating failure to properly consider and apply supportability and consistency factors is grounds for remand (citations omitted; collecting cases)).

D. Lack of Substantial Evidence

In arguing the ALJ's RFC determination lacked supporting substantial evidence, Plaintiff highlights the ALJ's reliance upon the opinion of non-examining Consultant Lieber-Diaz. (See Reply at 2.) He contends "the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability." (Id. at 2-3 (quoting Soto v. Comm'r of Soc. Sec., No 19-CV-4631, 2020 WL 5820566, at *7 (E.D.N.Y. Sept. 30, 2020); further citation omitted).) The Court agrees. See Poceous v. Comm'r of Soc. Sec., No. 20-CV-4870, 2024 WL 3029197, at *14 (E.D.N.Y. Jun. 17, 2024) ("[I]t is well-settled that without the support of an opinion by an expert who actually examined Plaintiff, the non-examining doctor's opinion cannot constitute substantial evidence supporting an RFC determination." (cleaned up; internal quotation marks and citation omitted)); see also Soto, 2020 WL 5820566, at n.20 (same; collecting cases). The ALJ's reliance upon Lieber-Diaz's opinion was misplaced.

It is perplexing the ALJ found Lieber-Diaz's opinion to be even "persuasive in part". (R. 60.) In addition to being relatively stale in comparison to subsequent opinions, significantly Lieber-Diaz neither examined Plaintiff nor had all his records before her. Further, as Plaintiff aptly argues, Consultant "Lieber-Diaz's opinion is unsupported by the other medical source opinions in the record, including the opinions of

agency [E]xaminer Dr. Acer and treating social worker Dina Macaluso." (Reply at 3.) Indeed, it is well-established that the medical opinion of a non-examining medical expert is entitled to little weight, especially when a claimant's impairments are based upon his mental health. See, e.g., Skartados v. Comm'r of Soc. Sec., No. 20-CV-3909, 2022 WL 409701, at *9 (E.D.N.Y. Feb. 10, 2022) (remanding because ALJ relied upon opinion of non-examining agency consultant who relied upon opinion of consultant who examined claimant only once and did not consider entirety of claimant's lengthy mental health history). Rather, "courts frequently find that RFC determinations that depend entirely on the opinions of non-examining experts and one-time consultative examiners are not supported by substantial evidence." Agostino v. Kijakazi, No. 22-CV-7235, 2024 WL 1259247, at *5-6 (E.D.N.Y. Mar. 25, 2024) (internal quotation marks omitted); cf. Estrella, 925 F.3d at 98 ("We have frequently cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." (internal quotation marks omitted)); Fintz v. Kijakazi, No. 22-CV-0337, 2023 WL 2974132, at *5 (E.D.N.Y. Apr. 15, 2023) ("While heavy reliance on a one-time examiner's opinion does not automatically constitute a legal error, the Second Circuit has warned that heavily relying on an examiner who only examined a claimant once is inadvisable."). "This concern is even more pronounced in the context of mental illness where . . . a one-time

snapshot of a claimant's status may not be indicative of h[is] longitudinal mental health." Estrella, 925 F.3d at 98. This applies more so to a non-examining consultant since, in cases where mental health is the most limiting disability, it is generally "improper to rely on the opinion of a non-treating, non-examining doctor[,] because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." Ron I., 2024 WL 4678398, at *8 (citing Velazquez v. Barnhart, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007)).

Moreover, the ALJ failed to consider how consistent Dr. Acer's and Macaluso's opinions were to each other; unlike Lieber-Diaz, Dr. Acer and Macaluso found Plaintiff had marked or extreme limitations. Yet, without meaningful explanation, the ALJ found Dr. Acer's and Macaluso's opinions were not supported by the overall evidence. (See R. at 60-61.) First, the ALJ's failure to consider how consistent Dr. Acer's and Macaluso's opinions were with one another is another reason to remand this case. See Navedo, 616 F. Supp. 3d at 349. Second, the ALJ's faulting Dr. Acer's opinion for being "based mostly on [Plaintiff]'s subjective complaints" is unpersuasive given Plaintiff's subjective complaints are consistent with other documented mental status examination findings. See id. at 348 and n.7. Third, the ALJ's failure to explain why, in making his RFC determination, certain

portions of Dr. Acer's opinion were persuasive and other portions were not is error and grounds for remand. See Schonfeld, 2023 WL 2625833, at *15 ("The inconsistency of the ALJ's simultaneous reliance and rejection of Dr. Antiaris's findings concerning Plaintiff's limitations constitutes an error."); see also Guadalupe v. Comm'r of Soc. Sec., No. 20-CV-4522, 2021 WL 8323596, at *13 (S.D.N.Y. Dec. 16, 2021) (finding "ALJ erred by cherry-picking within individual opinions" where "ALJ credit[ed] part of a certain opinion to support a finding, while simultaneously rejecting another portion of that same opinion" without "provid[ing] good reasons for doing so").

Furthermore, notwithstanding acknowledging Plaintiff suffers from the severe impairments of an affective disorder, an anxiety disorder, and PTSD (see R. 85), the ALJ baldly concluded "the evidence does not establish the presence of the paragraph C criteria." (R. 56.) Indeed, he provided no discussion whether Plaintiff could demonstrate a minimal capacity to adapt to changes in his environment or to demands not already a part of his daily life, part of the paragraph C analysis. Rather, without citation to the record or elucidation, the ALJ simply stated said record does not so establish such a capacity. (Id.); cf. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. Yet, at his 2019 Disability Hearing, Plaintiff testified, inter alia: feeling overwhelmed, worthless, and suicidal; he has to plan out his days to avoid and

limit triggers; he is always "on edge" not knowing whether he will have a good day or bad day; he suffers from lack of sleep, which is caused by his lack of a permanent residence, thereby inhibiting his effective use of his CPAP mask, as well as by nightmares and flashbacks to his childhood traumas; he has trust issues, making it difficult for him to be around others; when he is having a "bad day", which occurs about three times per week, he will isolate himself and not even answer his friend's calls; and, when experiencing anxiety, he feels: extreme pressure in his chest; overwhelmed; or, like dying. (R. 145, 150-54.) At a minimum, such testimony presented colorable evidence warranting a further discussion of the paragraph C criteria "of Listing 12.04 (Depressive, bipolar and related disorders) or Listing 12.06 (Anxiety and obsessive-compulsive disorders)." Otero v. Kijakasi, No. 20-CV-7612, 2022 WL 1051164, at *14 (S.D.N.Y. Mar. 1, 2022), report and recommendation adopted, 2022 WL 951061 (S.D.N.Y., Mar. 30, 2022); see id. at n.10 (discussing, inter alia, the paragraph C criteria that must be established for Listings 12.04 and 12.06); see also, e.g., Grady v. Comm'r of Soc. Sec., No. 20-CV-3739, 2024 WL 4607231, at *9 (E.D.N.Y. Oct. 28, 2024) (finding where the record presented colorable evidence of Listing 12.06 symptoms, further discussion of paragraph C criteria was warranted and ALJ "was obligated to take steps to further develop the record" (citations omitted)); Schonfeld, 2023 WL 2625833, at *11 ("The

heightened duty [of the ALJ to develop the administrative record] derives from the fact that a [p]laintiff's mental illness may greatly impede an evaluator's assessment of a plaintiff's ability to function in the workplace, thus necessitating a more thorough review." (cleaned up)); cf. Garcia v. Comm'r of Soc. Sec., 496 F. Supp. 2d 235, 242-43 (E.D.N.Y. 2007) (where ALJ's findings did not satisfy the criteria of Listing 12.04, finding there was not substantial evidence to support ALJ's decision). Upon such a showing, the ALJ should have taken further steps to develop the record. See, e.g., Jackson v. Kijakazi, 588 F. Supp. 3d 558, 577 (S.D.N.Y. 2022) (stating ALJ's duty to develop record "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." (emphasis added; citations omitted)).

Moreover, the ALJ's purported rationale for his paragraph C determination, i.e., that Plaintiff "is able to manage daily activities independently, can shop, and spend time with others" (R. 56) is confusing given the record presented.[11] First,

---

[11] This Court has recognized, "[i]n the Social Security disability context, it is well-settled that the ability to engage in daily living activities, which may be considered in assessing a claimant's subjective complaints . . . , does not necessarily translate into being able to engage in work-related activities." Poceous v. Comm'r of Soc. Sec., No. 20-CV-4870, 2024 WL 3029197,

the ALJ fails to identify the daily activities demonstrating more than marginal adjustment capacity. Second, as to shopping, the ALJ failed to include the important caveat that Plaintiff testified he shops early in the morning to avoid people. (R. 142-43.) Third, Plaintiff consistently reported spending time with one friend only, his childhood friend who—significantly—Plaintiff viewed as his second therapist.[12] (R. 149.) To the extent

---

at *12 (E.D.N.Y. June 17, 2024) (citations omitted); see also, e.g., McLean v. Comm'r of Soc. Sec., No. 19-CV-6068, 2023 WL 8021473, at *11 (E.D.N.Y. Nov. 20, 2023) (rejecting ALJ's reliance on claimant's "participation in various group therapies, helping others, being able to travel, handling her father's affairs, and applying for various benefits as evidence of . . . significantly improved symptoms" and retained "capacity for regular work" because "such activities 'ha[ve] little relevance to [claimant's] ability to function in a work setting where he would need to interact appropriately with co-workers and take instructions from authority figures'" (quoting Ferraro v. Saul, 806 F. App'x 13, 16 (2d Cir. 2002)).

Here, the ALJ generalized Plaintiff's daily activities. His summary assessment of Plaintiff's daily activities truncates the nuances of Plaintiff's testimony. For example, as to driving: At the 2019 Disability Hearing, Plaintiff testified that, although he had a driver's license, he does not drive, explaining: "[I]t's hard for me to drive. I feel when I'm driving, like seeing cars coming towards me, from my car accident, it's something that plagues me. So, I try not to drive as much as I can." (R.142-43.) He further clarified that he had driven approximately two weeks prior to the Hearing, going to the grocery store early to avoid people. (R. 143.) Another example of the ALJ obfuscating the evidence is his identifying Plaintiff's listening to music as a daily activity; however, Plaintiff utilized listening to music as a means of dealing with his depression and anxiety. (R. 383.) Indeed, it was part of his plan to assuage anxiety attacks. (See R. 578.)

[12] Plaintiff further explained his friend: listens to him; gives him advice; and, checks up on him when he does not answer his friend's phone calls. (R. 149, 154.)

Plaintiff mentioned two other friends, he also stated they "live out of state" (R. 152); thus, it is puzzling how Plaintiff would be able to spend time with them. In sum, the ALJ's rote recitation of the paragraph C standard together with his lack of explanation for his paragraph C determination frustrates meaningful review of his decision. See Jablonski v. Comm'r of Soc. Sec., No. 18-CV-0597, 2019 WL 4439453, at *4 (W.D.N.Y., 2019) ("[T]he ALJ provided no explanation of how he found the paragraph (C) criteria were not satisfied, precluding this Court's meaningful review. Instead, the ALJ simply regurgitated the paragraph (C) criteria . . . ."). "As such, in the absence of meaningful analysis by the ALJ of the paragraph (C) criteria, the Court finds remand for further proceedings is necessary."[13] Id.

[13] The Court notes the ALJ's consideration (or lack thereof) of part of the VE's testimony also gives the Court pause. At Plaintiff's 2019 Disability Hearing, when the ALJ questioned the VE about the subject hypothetical individual, he posed an additional scenario for the VE's consideration: Would there be jobs available for the hypothetical individual if that individual was "either off task for more than 15 percent of the workday in addition to normal breaks or absent from work two or more days per month". (R. 160.) The VE testified either scenario "would preclude competitive employment". (Id.) Yet, in his determination that Plaintiff was not disabled, the ALJ glaringly failed to take into consideration the VE's testimony about an individual being off-task 15 percent of the time or being absent two or more days per month. (R. 62-63.) Indeed, he did not even provide the required explanation for his decision to ignore this portion of the VE's testimony, which would require remand for the ALJ to do so. See Karle v. Colvin, No. 12-CV-3933, 2013 WL 4779037, at *3 (S.D.N.Y. Sept. 6, 2013) (remanding case where ALJ ignored VE's testimony that it would be difficult to find employment for hypothetical individual who would be excessively off task); see

Finally, the Court observes that the ALJ noted an apparent gap in Plaintiff's treatment between August 2016 and Summer 2018, which he relied upon, in part, to conclude Plaintiff does not suffer marked or extreme functional limitations. (See R. 60.). However, said "gap" appears to coincide with the reports from the Suffolk County Social Services ("SCSS") Employment Program (hereafter, the "Reports"), which Reports show the SCSS concluded Plaintiff was exempt from its Employment Program for a period running from May 24, 2017 through May 5, 2018, because of his mental health. (See R. 471-81.) Other than acknowledging their submission (see R. 140), at the 2019 Disability Hearing, the ALJ did not inquire about Plaintiff's involvement in the SCSS Employment Program or his corresponding treatment, if any, as contemplated by that Program. In his decision, the ALJ summarily rejected the Reports as unpersuasive and "inconsistent with the overall evidence." (R. 60.) Yet, if nothing else, questioning Plaintiff about the SCSS Employment Program might have provided relevant gap-fill, i.e., further medical opinions for the time-period in question. See, e.g., Ron I., 2024 WL 4678398, at *5 (explaining, "while ALJs may disregard the decisions, conclusions,

also Karle v. Astrue, No. 12-CV-3933, 2013 WL 2158474, *18 (S.D.N.Y. May 17, 2013) (recommending case be remanded because, inter alia, ALJ failed to provide required explanation for his decision to ignore VE's testimony regarding hypothetical individual who would require time off task, thereby making it difficult to find said individual employment) (collecting cases).

or findings of other benefits programs, they may not disregard the medical opinions underlying those decisions, conclusions, or findings, to the extent they otherwise contain competent evidence" (citation omitted)). Given the Reports recognize Plaintiff's mental health as a barrier to employment, the Reports addressed the submission of treatment assessments, and the ALJ's duty to develop the record, especially when faced with a claimant asserting mental health impairments, see Schonfeld, 2023 WL 2625833, at *11, the ALJ's failure to make further inquiries about underlying treatment assessments provides an independent basis to remand this case. See, e.g., Grady, 2024 WL 4607231, at *8-9 (finding ALJ's failure to fully develop administrative record was a threshold basis to remand case) (collecting cases); see also Ron I., 2024 WL 4678398, at *6 (remanding case where ALJ failed to consider "supporting evidence" including medical opinions from another agency; collecting cases).

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion (ECF No. 17) is GRANTED, and the Commissioner's Cross-Motion (ECF No. 20) is DENIED. This matter is REMANDED for proceedings consistent with this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment accordingly and, thereafter, mark this case CLOSED.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: December 11, 2024
Central Islip, New York